**American Arbitration Association**
**Commercial Arbitration Tribunal**
**01-19-0000-6924**

**HUMANA HEALTH PLAN, INC.,**

**HUMANA INSURANCE COMPANY, and**

**HUMANA PHARMACY SOLUTIONS,**
**INC.**

      **Claimants,**

**v.**

**CVS Pharmacy, INC. and CVS Health Corp.,**

      **Respondents.**

### AWARD

THE UNDERSIGNED ARBITRATOR was designated in accordance with the arbitration agreement between the above-named parties as described below, duly selected, appointed and sworn. He heard the proofs and allegations of the parties at the hearing at the offices of Stein Mitchell Beato & Missner LLP located at 901 15th Street Northwest, Suite 700 in Washington, DC on November 9-12, 2021, and November 15-19, 2021 where Richard Smith, Mark Sweet, Nicholas P. Peterson, Wesley E. Weeks and Enbar Toledano of Wiley Rein, LLP of Washington, DC and Robert Gilmore, Jed Wulfekotte and Susie Kim of Stein Mitchell Beato & Missner, LLP of Washington, DC represented Claimants.  Grant Geyerman, Enu Mainigi, Craig Singer, Jamie Wolfe and Kylie Hoover of Williams & Connolly, LLP of Washington, DC represented Respondents. Twenty-seven witnesses presented live testimony. Eighteen other witnesses provided testimony via recorded video and/or transcript testimony. The parties introduced more than 300 exhibits.   After considering the exhibits, testimony, briefs, and other submissions of the parties, the arbitrator makes the following findings and conclusions and issues this AWARD:

**Parties, Claims, Rules, Agreements and Stipulations**

1.      <u>Claimants</u>. Claimants Humana Health Plan, Inc., Humana Insurance Company, and Humana Pharmacy Solution, Inc. ("Humana"), initiated these claims by demand filed on March 1, 2019.

1.      <u>Respondents</u>.  Respondents CVS Pharmacy, Inc. ("CVS Pharmacy" or "CVS") and CVS Health Corp. filed an Answering Statement on April 3, 2019.

2.      <u>Arbitration Agreement</u>.  This arbitration occurs under Article 12 of the October 2001 National Chain Pharmacy Provider Agreement (the "Agreement"), Ex 8, between  CVS Pharmacy and certain of its affiliates as "Provider" and Claimant Humana Insurance Company and certain of its affiliates, as amended by amendment Number 7 as of April 1, 2008.  Ex 76

3.      <u>Rules</u>**.**  As provided by Article 12 of the Agreement, as amended, this arbitration proceeded under the Commercial Rules of the American Arbitration Association. ("AAA") At the preliminary hearing, the parties agreed that the provisions of the AAA Commercial Rules for Large, Complex Commercial Disputes would also apply.

4.      <u>Place of Hearing</u>.  Although the arbitration agreement designated Atlanta, Georgia as the hearing location.  The parties later agreed to hold the hearing at the offices of Stein Mitchell Beato & Missner LLP in Washington, DC.

5.      <u>Applicable Law and Jurisdiction</u>.   The parties agreed Kentucky law controls the claims and defenses presented and that the Federal Arbitration Act also applies to this arbitration. They further agreed that, except for Respondents' contention that the arbitrator lacks jurisdiction over Respondent CVS Health Corporation, the arbitrator has jurisdiction over the claims asserted in the demand for arbitration as well as Claimants and Respondent CVS Pharmacy, Inc.

6.     <u>Claims</u>.  Humana's claims are set forth more fully in its arbitration demand. Respondents' defenses are also set forth in detail in their answering statement.   Humana's claims arise from CVS's handling of pricing made available under two programs, the Health Savings Pass ("HSP") program CVS launched in November 2008 and the Reduced Rx Program launched in May 2017 and administered by CVS affiliate Caremark.   Participants in the HSP program were able to purchase certain medications at a reduced membership price.  Participants in the Reduced Rx program can obtain three types of Novo Nordisk insulin for a payment of $25 that is supplemented by an additional payment from Caremark to the selling pharmacy using funds provided by Novo Nordisk to Caremark.  Humana contends that the Agreement obligated CVS to report to Humana as the CVS usual and customary ("U&C") charge both the reduced HSP membership prices and the $25 Reduced Rx payment and, further, that CVS's failure to do so breached the express terms of the Agreement as well as the Agreement's implied covenant of good faith and fair dealing. Claimants also asserted that CVS's failure to report these amounts as U&C charges for these medications resulted in liability based on negligent misrepresentation and unjust enrichment. After the hearing, at the request of the arbitrator, the parties conferred regarding the most appropriate scope of initial post hearing briefing.   They agreed to limit their post hearing briefing initially to whether CVS is liable on Respondents' breach of contract and other claims. The parties, thus, have deferred briefing on Respondents' affirmative defenses, the calculation of Humana's damages, and any issues regarding jurisdiction over Respondent CVS Health Corp. until after a ruling from the arbitrator regarding CVS's liability.

7.     <u>Stipulations of the Parties</u>.  The parties stipulated as follows:

      a)     CVS launched the Health Savings Pass or "HSP" program on November 9, 2008.

b)   HSP members could purchase up to a standard 90-day supply of approximately 400 generic drugs for $9.99 (or $11.99 starting on January 1, 2011). There were different prices for a limited number of medications, and, in certain states, HSP members purchasing more than a standard 90-day supply paid a price higher than $9.99/$11.99.

c)   CVS terminated the HSP program effective January 31, 2016.

d)   On August 1, 2010, CVS raised its minimum retail price from $10.99 to $11.99.

e)   During the period January 1, 2011–January 31, 2016, CVS populated $11.99 in the U&C field on approximately 22% of Humana insured claims involving HSP-eligible drugs.

f)   The Reduced Rx program started on May 10, 2017.

**Factual Findings**

In addition to accepting the stipulations, after reviewing and weighing the testimony and other evidence submitted, the arbitrator makes the following factual findings:

8.   The Agreement became effective in October 2001. Ex 8 at 17.[1]

9.   Even though either side could terminate the Agreement without cause on 180 days' notice, Ex 8 at 12, the Agreement remained in effect from October 2001 through the hearing with twenty-seven amendments.   Veale[2] Tr 1635.

---

[1] In this award, "Ex" refers to Exhibit; "Tr" refers to the hearing transcript.
[2] References to the hearing transcript will begin with the last name of the witness and include the pages of the transcript as Tr _____.

10.     In the Agreement, CVS agreed to provide prescription drugs to Humana members, i.e., people covered under Humana plans or plans administered by Humana. Ex 8 §§1.7, 1.14, 2.2.

11.     Although the Agreement's pricing formula is complicated, the Agreement makes clear that CVS may not charge Humana more than its U&C charge for any prescription. Ex 8 § 4.3. Exhibit D. Moreover, CVS may not charge a Humana member a copayment greater than its U&C charge for the drug involved. *Id.* Thus, the meaning of U&C charge is a critical part of the Agreements' pricing formula.

12.     Although the term "usual and customary charge" is a critical part of the pricing formula of the Agreement, the Agreement, including its amendments, does not provide a definition.   Veale Tr 1636.

13.     Section 4.1 of the Agreement requires that CVS submit claims for payment in "a standard version of the National Council for Prescription Drug Plans (NCPDP) acceptable to Humana."  Ex 8 at 6. Claims must be transmitted on a "properly completed electronic claim transmission."  Ex 8 at 7 §4.4. The submission must use "the latest NCPDP standards."  Ex 8 at 21 ¶7.

14.     During the relevant times, the NCPDP data transmission format had a field, 426-DQ titled "Usual and Customary Charge."  During the relevant times, the NCPDP Data Dictionary defined that term as the "[a]mount charged cash customers for the prescription exclusive of sales tax or other amounts claimed." Ex 5 at 71. The Data Dictionary does not, however, define the term "cash customer."  Graeff Tr 2374, McGinley Tr 2202

15.     In 2006, Wal Mart announced that it would offer a list of 300 generic drugs for only $4 to all customers.  Ex 25.  No one was required to enroll in any program or take any affirmative

steps to receive this low price.  Wal Mart reported $4 as its U&C charge for the drugs included on its list of generic drugs.

16.     Initially, CVS chose not to respond to Wal Mart's initiative and noted that the 300 drugs that Wal Mart offered for $4 were "older generics," that CVS's "[c]ash sales" of them were less than .5% of CVS's total pharmacy sales, and that under many plans the price for some of them was already "less than $4." Ex 26.

17.     Some of Wal Mart's other competitors, however, did respond with their own discounted prices for certain drugs.   Some, such as Target and Kroger, followed Wal Mart by offering low pricing that was instantly available to all customers without any sort of enrollment or membership fee.  These competitors, like Wal Mart, reported their universally available discounted prices as their U&C charge for the drugs involved.

18.     Other Wal Mart competitors responded with membership programs that offered low prices on a list of specific drugs only to those who enrolled in the programs.  Walgreens launched its membership program in November 2007.   It offered reduced prices to members of its Prescription Savings Club ("PSC") program.  PSC members had to enroll in the program and, at least in theory, pay an annual membership fee to access the reduced club prices.  See Walgreens Op[3] at 6.  Kmart had initiated a similar membership program as early as 2006. See *United States Ex Re.  James Garbe v Kmart Corp*., 73 F. Supp 3d 1002, 1008 (S.D. Ill. 2014) [*"Garbe D. Ct."*] Rite Aid initially launched its membership plan in five states including California before making it available nationwide in September 2008.  Unlike the Walgreens plan, Rite Aid's plan did not require a membership fee.  Ex 136.  Prior to CVS's launch of the HSP program, Pathmark and

---

[3] "Walgreens Op" refers to the November 8, 2021 Interim Award of the arbitrator in the Humana Health Plan, Inc., Humana Insurance Company, and Humana Pharmacy Solutions, Inc. v Walgreens Co. and Walgreens Boots Alliance, Inc. arbitration.

Drug Fair, other regional supermarkets, and other drug chains, Kerr Drug and Navarro Discount Pharmacies for example, had launched membership programs. McGinley Tr 2157-2158, Ex 937 ¶45.   The prevalent industry understanding during this time was that these membership program prices were not the relevant pharmacy's U&C prices. Ex 937 ¶47.

19.     Although CVS had not responded to Wal Mart's 2006 pricing initiative.  It did respond to the competition it faced from membership programs like those of Walgreens and Rite Aid.  CVS launched its HSP program in November 2008, about a year after Walgreens launched its PSC membership program.

20.     CVS intentionally structured its HSP Program to prevent its HSP prices from qualifying as its U&C charges. CVS was aware that if the reduced HSP prices qualified as U&C charges under the Agreement, this would dramatically reduce reimbursement to CVS under contracts, like the Agreement, that used U&C as a limit on the amount of reimbursement.

21.     As the parties stipulated, the CVS HSP program generally offered HSP members up to a standard 90-day supply of approximately 400 generic drugs for $9.99 (or $11.99 starting on January 1, 2011). In addition, the program offered a 10% discount, up to $10, on services from the CVS Minute Clinic.

22.     To become an HSP member and purchase for the HSP prices, a customer had to complete an enrollment form, either online or in person, and pay a $10 annual enrollment fee, which was increased to $15 in January 2011. See Ex 166.

23.     The enrollment form required a customer to provide identifying information like that required to obtain a prescription plus a waiver. Wingate Tr 722.   The waiver was intended to comply with HIPAA requirements and permit CVS to include the customer in marketing and other programs.  Wingate Tr 723.

24.     CVS considered the required annual fee an important element in distinguishing the HSP prices from U&C prices.  Ex 136, Ex 142.  CVS regularly and routinely collected the required fee. Wingate Tr 723, Ex 938 ¶45. CVS pharmacists were not permitted to waive the fee. Ex 193 p. 2.

25.     CVS did not submit HSP transactions to Humana or other insurance companies. HSP members with insurance could not use that insurance to purchase under the HSP program. They had to choose whether to use their insurance or their HSP member benefit. Gibbons Tr 430. When an HSP member used the program to purchase a medication, the transaction was adjudicated, i.e., it was submitted to the appropriate Pharmacy Benefit Manager ("PBM") in the same way that claims under insurance, discount card and other benefit programs were submitted. The PBM would determine whether the purchaser was enrolled and qualified to benefit from the HSP program, review the claim, dosage, strength, and quantity and respond to the CVS pharmacy as to what amount to collect from the HSP member.  Gibbons Tr 434, 465 – 466.

26.     When a customer purchased from a CVS pharmacy without using insurance or any other form of benefit, no adjudication was necessary.    The customer simply submitted the prescription, paid the retail price and received the medication.  Gibbons Tr 432 – 433.

27.     The annual fee and other terms of the CVS HSP program were not attractive to most CVS customers who purchased HSP eligible drugs without using insurance or any other form of benefit. As a result, relatively few of the people who purchased HSP eligible drugs from CVS without any form of benefit  chose to purchase through the HSP program.  Of the total number of CVS customers who purchased either through HSP or without any form of benefit, only 4.3% of those customers used the HSP program.  Barlag[4]  Tr 2772 and Barlag slide 17.  Further, only a

---

[4] The Barlag testimony cited here is based on a data set limited to transactions for drugs that were HSP eligible during the times that they were HSP eligible. Barlag TR 2786.

small portion, only about 21%, of the purchases by those customers (i.e. CVS customers who purchased without any form of benefit or through HSP) were through HSP.   Barlag Tr 2772 and Barlag slide 16.  There were 3.7 times as many purchases from CVS using no form of benefit than there were HSP purchases. *Id.*

28.    Because of the fee required for HSP membership, the limited number of drugs with reduced HSP prices, the fact that HSP reduced prices were focused on a 90-day supply of the drugs involved, and the relatively few purchases a year made by most CVS customers who purchased without insurance or any other form of benefit, the HSP program was not financially attractive to most of the CVS customers in that category.  Barlag Tr 2776-2780.  On average, for 80% of the CVS customers who purchased from CVS without insurance or any other form of benefit, paying the HSP membership fee and buying at HSP prices would result in their paying over 50% more for drugs than they would have paid by simply paying CVS retail prices, without joining HSP. *Id.*[5] Ex 938 ¶48.

29.    Although Gertner of Caremark referred to the HSP annual fee as "nominal", Ex 99, and CVS touted the value of the program, Ex 150,  in practice the $10 and $15 enrollment fees were not "nominal."  The average HSP member spent only about $64.68 annually on prescriptions. Ex 938 ¶ 47.  Thus, on average the fees represented a cost increase of more than 20%. *Id*. The fee had a significant negative impact on whether CVS customers without insurance were willing to enroll.  The increase in the enrollment fee from $10 to $15 reduced interest in the program by almost half.  Ex 942 at 15-18, 20.  The fact that so few CVS cash customers participated indicates that the customers disagreed with Gertner's conclusion.

---

[5] Although Humana's expert. Hayes. testified that the fee was "really nominal" because "anyone looking at the fee would realize that they were getting the savings" Hayes Tr 1143, her testimony on this point is undermined by Barlag's research and the fact that most CVS cash customers did not act as if they agreed with her evaluation.

30.     Humana knew the details of CVS's HSP program.    CVS announced its HSP program in a press release on October 30, 2008. Ex 161.  The press release provided the details of the program as well as a phone number and web site where the list of the HSP covered medications was available. Humana saw the HSP press release and the next day distributed it to the Humana Koch team, the team of people at Humana responsible for its commercial markets.  Ex 163 and Tr 582.  The media, including the Today show, the nightly news and other media outlets, widely reported the CVS HSP program.  Wingate Tr. 808.

31.     In addition to publicizing its HSP program through its press release, CVS implemented a plan to speak directly to its major payors, including Humana, about the program. The plan was to do this as soon as the press release issued and to let payors know the details of the program and, most importantly, that its prices would not be CVS's U&C price.  Veale Tr 1624 - 1625.  CVS counsel developed a template for these communications. See Ex 193. The template provided details about the HSP program and specifically stated that the HSP program was "very different from the discount pricing Wal-Mart and others [had] introduced" and, thus, the HSP prices were not "Usual and Customary pricing."[6] Wingate, the leader of CVS's payor relations team, and other members of her team were assigned to contact the major payors dealing with CVS using the template as a guide.

32.     Wingate was responsible for the payors who were the major PBMs dealing with CVS.  Wingate Tr 810.  She personally spoke to the leaders of provider relations at those PBMs, including Express Scripts, MedImpact, and Caremark, to make sure they knew the details of the HSP program and that CVS would not report the HSP prices as its U&C charge.  Wingate Tr 808

---

[6] Although the version of the template in Ex 193 refers to pricing for CVS "Medicaid clients," this was obviously a reference inserted for a communication with a Medicaid provider and was intended to be revised for other types of payors.  Wingate Tr 820, Veale Tr 1633.

- 813.  None of them expressed any concern or disagreement with CVS's position.   Wingate Tr. 813.

33.     Other members of Wingate's provider relations team were assigned to contact the major payors in the regions under their responsibility.   Another team member, Morrison was responsible for communicating with state Medicaid agencies with whom he had a relationship. Wingate Tr 815.  Each was responsible for contacting the assigned payors and providing the information in the template, i.e., the details of the HSP program and the fact that CVS did not consider the HSP prices to be U&C charges.  Wingate Tr. 808- 822.

34.     Morrison began communicating with state Medicaid agencies using language from the template even before HSP became effective.  Ex 170 shows that his contacts at Texas Medicaid, at least initially, did not think the HSP prices should be considered U&C charges.  In January 2009, CVS in house counsel used language from the template to communicate similar information re the HSP program to officials of the Connecticut Medicaid program who had raised concerns regarding whether the HSP prices should be treated as U&C charges for purposes of Connecticut state Medicaid. Ex 216.

35.     Veale, a member of Wingate's payor relations team, began to contact her payor clients by phone as soon as the press release was public.  She spoke to key people at her payor clients and reviewed the points of the template with them.  Veale Tr 1626 – 1628, 1632-1633. None of them expressed any disagreement with CVS's announcement that the HSP prices would not be treated as U&C prices.   Veale had further follow-up calls with her payor contacts.  None of them questioned CVS's statement that the HSP prices would not be reported as U&C. Veale Tr 1629.

11

36.     Ex 193 shows that CVS sent the template to Zavalishin of Aetna, an insurance company, in December 2008.   Aetna expressed no concerns to CVS regarding CVS's decision that HSP prices would not be reported as U&C charges.  Wingate Tr 822.

37.     The CVS payor relations team met by phone at least every Monday. Veale Tr 1623. It was Veale's understanding that each member of the team, as directed by Wingate, had contacted their payor clients to review the key points in the template, including the fact that CVS would not be reporting HSP prices as U&C charges and that none of them expressed any disagreement with CVS's determination that its HSP prices were not U&C prices.    Veale Tr 1629.  Wingate had the same understanding. Wingate Tr 769.

38.     Robert Marks was the member of the CVS payor relations team who was responsible for CVS's relationship with Humana in 2008 when CVS launched HSP.  His contact at Humana was Sarah Blanton. Wingate Tr 909.  He was assigned to communicate with Humana regarding the HSP program and the fact that CVS did not consider HSP prices to be U&C prices. Veale Tr 1625 - 1626.  His death in 2010 prevented him from testifying in this proceeding. Wingate, his team leader, like Veale, a team colleague, expected, and reasonably assumed, that he, like the other CVS payor relations team members, complied with Wingate's directive and communicated with his contact at Humana in late 2008 about the details of the HSP program and the fact that CVS did not consider the HSP prices to be U&C charges, without receiving any indication of concern from Humana.  Veale Tr 1629, Wingate Tr 769.  Marks was in regular day-today communication with Humana.  Wingate Tr 769.

39.     By the by the time of the hearing, Blanton, Mark's main contact at Humana, was no longer employed by Humana.  Humana's 30 (b)(6) witness, Duke, did not interview Blanton in preparation for his deposition testimony as Humana's representative, nor did Humana present any

testimony from her at the hearing, nor did she respond to the subpoena CVS issued to her seeking her testimony at the arbitration hearing.  Tr 2442.

40.    Humana investigated a sample of its claims data in 2006 when Wal-Mart announced its $4 generic program to confirm that Wal-Mart was reporting the $4 as its U&C for those drugs.  Van Hook Tr 307-308, Ex 36,  37.    But there is no evidence that Humana made a similar investigation in the initial months after CVS launched its HSP program.  There would have been no reason for Humana to do an investigation if it indeed had received, as CVS contends, a clear communication from CVS that it was not reporting HSP prices as U&C.

41.    Although Humana may not have had the data to do a comprehensive audit of all CVS claims to determine completely and precisely the extent to which CVS was submitting its HSP prices as its U&C charges, Humana was not  "a helpless naif" and could have, had it wished, used "publicly available information and its own claims data" to discover through reasonably targeted sampling whether CVS was submitting HSP prices as U&C. The Walgreens Op arbitrator reached a similar conclusion.  See Walgreens Op at 36.

42.     Humana did not make any objection to CVS about its failure to treat HSP prices as U&C in 2008, 2009, 2010, or at any time before CVS ended the HSP program in January 2016. It was not until two years after CVS ended the HSP program that Humana's August 2018 letter, Ex 817, asserted for the first time that CVS's failure to report its HSP prices as U&C charges had violated the Agreement.  Duke Tr 198-199.

43.    In addition to the testimony of the CVS witnesses noted above about CVS's initial strategy of contacting its leading payors, including Humana, when CVS launched the HSP program, there is ample additional evidence that (a) Humana must have known for years, prior to its August 2018 objection, that CVS and the other pharmacies with  membership programs  did

not consider their membership prices to be U&C charges and (b) that Human's acceptance of this was consistent with the prevalent industry understanding of the meaning of U&C charges during the time before the November, 2014 decision in Garbe D. Ct. and the May 2016 decision in *United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632 (7th Cir. 2016) ("*Garbe*") announced a contrary determination regarding the Kmart membership prices based on the record in that case.

44.     From at least 2006 through at least October 2007, the Humana personnel working with its pharmacy networks made a distinction between prices like those of Wal Mart which were available to all customers and prices like those under the Kmart program that were available only to members. They did not consider a membership program price to be the U&C price or the "cash" price.   Lambert Tr. 1798-1799, Ex 995 ¶19.  Lambert, Humana's Director of Pharmacy Networks until October 2007, did not expect a pharmacy to submit its membership price as its U&C charge.

45.     Consistent with Lambert's understanding, Humana was aware beginning roughly sometime in 2008, that pharmacies like Walgreens and CVS were not reporting their membership program prices as U&C.  Dostal, vice president of supply chain strategies and analytics for Humana's in- house PBM, Humana Pharmacy Solutions, Inc., confirmed this.  Dostal Dep  17, 125 – 126.

46.     Dostal and others at   Humana subscribed to and read the annual U.S. Pharmacy Industry: Economic Report & Outlook published by Dr. Adam Fein. They respected his "economic background" and experience in "pharmacy and managed care and manufacturer relations."  Dostal Dep 74 -75 and Ex 415 and 415A.   The September 2009 edition of that report summarized the industry response to Wal Mart's discount generic program, including the membership programs offered by Walgreens and CVS.  It noted that "[b]ecause of the enrollment fees and membership requirements, these programs did not change the U&C retail list price." Ex 282 at 32.

47.     The initial position[7] of numerous state Medicaid programs was the same as that reported by Dr. Fein. Ex 228 (January 29, 2009 email from Nebraska Medicaid "[b]ecause of the enrollment fee, we don't consider club prices as U&C"); Ex 184 (December 2, 2008 email from Oklahoma Medicaid "the enrollment/membership fee is a way around the 'usual and customary' pricing requirement."); Ex 188 (December 3, 2008 email from Indiana Medicaid, because of the "enrollment fee" the membership price is not U&C.); Ex 226 (January 29, 2009 email from Missouri Medicaid, "the club price … isn't considered their U&C," and from Rhode Island Medicaid, "you have to buy the card to get the savings .. don't think this is considered U&C."); Ex 301 (November 2009 email from Maryland Medicaid, where there is a fee to join, club prices are "exempt from a U/C."); Ex 346 ( June 2010 emails from California and Minnesota Medicaid, neither club prices nor discount card prices are required to be submitted as U&C.); Ex 353 ( June 2010 email from Georgia and Wisconsin Medicaid, they have same approach as Minnesota.); Ex 510 (June 2012 emails from Illinois, South Carolina, Mississippi, Arkansas, and Colorado Medicaid, club prices not "extended to Medicaid" if "you have to pay a fee for membership," not U&C because there is "enrollment.")

48.     The position of PBM's such as Argus, Medco, Caremark, Express Scripts, Prime Therapeutics LLC, and Optum Rx was also the same as that reported by Dr. Fein, i.e. that the prices of a membership program such as CVS's HSP program that required a fee and enrollment were not U&C charges. Ex 937 p. 12 and note 25, Kaiser Tr 2466, Spadaccino Tr 1984, Correia Tr 2044, Compton Dep. 35- 37.  Humana contends that their testimony is irrelevant because they

---

[7] After the Garbe case was unsealed in 2010 and became more well known, however, many states understandably changed their position.  Humana notes that in 2017 the federal government and 39 states joined a qui tam suit seeking to recover from Walgreens based on Walgreens not submitting its membership prices as U&C to state Medicaid programs. Humana Reply at 10, Their initial positions, however, are more indicative of the industry understanding of the "U&C charges" during the relevant time than their conduct after  the Garbe decisions.

have no knowledge of the Agreement at issue here or negotiations regarding it. But where their testimony shows the industry understanding, it is directly relevant to the key issue here.

49. The pharmacy industry accepted and relied on the conclusions in Dr. Fein's 2009 report and referred it in the 2013 Update to Pharmaceutical Payment Methods published by the Academy of Managed Care Pharmacy ("AMCP"), which at pages 43 – 44 cited Dr. Fein's 2009 report as supporting its finding that the prices of "a community pharmacy generic program available only to" members of a club "are not the pharmacy's 'usual and customary' prices." Ex 540. The AMCP is a "reputable" pharmacy-benefits trade organization. Duke Tr 169. Carrie Lovell and William Fleming, both key Humana people dealing with CVS's pricing, were involved in the AMCP. Wingate Tr 840 – 841.

50. The evidence related to the issues that Humana confronted regarding the Walgreens and Rite Aid membership program prices confirms Dostal's testimony. Like CVS, Walgreens and Rite Aid did not accept insurance for purchases made through their membership programs or submit claims for those purchases to insurers. Nor did they report the reduced prices charged to club members as their U&C charges. In fact, they chose to respond to Wal Mart's pricing initiative with membership programs specifically so that they might avoid having to report the new low prices as their U&C charge and have those new low prices reduce their reimbursement from insurers whose contracts imposed a U&C limit on reimbursement.

51. As a result, Humana insureds could in some instances purchase a drug from Walgreens or Rite Aid under their membership programs for less than they might obtain it through Humana's plans. Humana insureds complained about this to Humana and, beginning in March 2009 and, at least by mid-2009, Humana was aware that neither Rite Aid nor Walgreens were submitting their reduced membership prices as their U&C charges. See Duke Tr 144-145, Lambert

Tr 1804, and Ex 241, 245.  264.  For example, Spicer, Humana's then Manager of Cost and Savings for Pharmacy Networks, noted in June 2009 that although "Wal-Mart, Kroger and Target" set their "$4" generic low price "as the U&C," pharmacies like Walgreens, K-Mart, RiteAid and Bi-Lo "do not" because  their " 'discount program' "  "requires membership." Ex 262.   Humana was further aware that, because of the Walgreens and Rite Aid membership programs, Humana members could, at times, purchase drugs under those membership programs at a lower price than they might obtain by using Humana's insurance.  See Ex 241, 245, 262, 264. In June 2009, Spicer explained to Mark Morse at Humana Pharmacy Solutions that Humana insureds would at times pay more using their Humana insurance because the reduced price for a generic drug under membership plans "isn't always coded as U&C." Ex 263.

52.     More importantly, Humana was aware that its insureds were frustrated by the fact that they might pay more under Humana insurance than they would pay under the Rite Aid membership program and that it seemed to insureds that their Humana insurance was "a hinderance."  Ex 245.  As a result, Laura White of Humana suggested that Humana have a "pound sand conversation" with Rite Aid.  But, in the end, she never brought the issue up with Rite Aid and, at the hearing in this matter, could not recall why she failed to do so.  Ex 245 and White Tr 614.

53.     Humana was also aware of CVS's dispute with Connecticut Medicaid regarding whether HSP pricings should be treated as U&C pricing. In 2010, the Connecticut Medicaid Program took the position that CVS's HSP prices were U&C charges that should have been passed along to that program.  Wingate Tr 832.  When CVS disagreed, Connecticut revised its laws to require that HSP prices be considered U&C charges for purposes of its Medicaid program.  In response, CVS threatened to discontinue the HSP program from Connecticut.  Ex 355.    This

triggered an investigation by the Connecticut Attorney General, who issued a press release in June

2010 regarding the investigation and described in some detail the dispute that led to it.   Ex 355,

Wingate Tr 835.   Articles in the Wall Street Journal and the Associate Press followed.  Ex 357,

358.   CVS made clear that CVS considered it "economically unfeasible to continue" the HSP

program if the HSP prices were considered U&C charges.   Ex 368.   The AMCP followed the

Connecticut dispute and provided details to its members.  Lovell and Fleming of Humana received

those briefings.  Ex 367.  Wingate Tr 840 -841.  CVS and Connecticut Medicaid ultimately reached

a settlement in which CVS made price concessions but did not agree to report its HSP prices as

U&C. Wingate Tr 843.

54.     Humana expressed no concern at all to any pharmacy regarding failure to report

membership prices as U&C until December 2017, when, for the first time, it complained to

Walgreens about its failure to report its membership prices as U&C.   Duke Tr 200, Ex 800.

55.     In May 2013, Wehneman, Humana's director of pharmacy audit,  Duke Tr 174,

explained to his boss McCullough (who served Humana as COO, CFO and CFO of Pharmacy

Benefit Management at various times, Wehneman Tr  1034, that Wehneman  expected that "the

pharmacies" would take the position that their membership prices were not "available to the

'general public' and thus not their U&C."  Ex 566.   No one asked him to investigate whether the

pharmacies, such as CVS, were reporting their membership prices as the U&C charge, even though

Wehneman would have been able to confirm his expectation had he been asked to investigate it

further.  Wehneman Tr 1082.

56.     Prior to being influenced by *Garbe*, Wehenman, head of auditing for Humana was

firmly of the opinion, based on his knowledge and industry understanding of the term U&C and

the NCPDP definition, that that "when a pharmacy had a membership program with enrollment [,]

[ the prices under that program ] did not affect the U&C price that would be reported to third parties." Wehenman Tr 1036, 1043 -1044, 1052. The rationale, he explained, was that by enrolling in a program, the customer no longer was a cash customer. Wehenman Tr 1041-1042.

57.     Moreover, Humana and CVS representatives communicated easily and frequently. Duke Tr 200. Humana was aware that that at least some pharmacies with generic membership programs were not reporting their membership prices as U&C. There is no evidence that Humana's awareness generated sufficient concern at Humana to cause anyone to contact CVS and directly ask whether it was reporting its HSP prices as U&C. Nor is there any evidence suggesting that CVS would have misled Humana had it asked CVS directly about this.

58.     In December 2013, in response to a complaint received by Humana's special investigations unit about a pharmacy not using its membership price as its U&C price, Wehenman pointed out to senior members of the relevant Humana team that the use of membership pricing programs was "the way we expect chains try to get around the U&C requirements" in relation to the programs offering generic drugs at low prices, he referred to those programs generally as "$4 lists." He further remarked that this was what "WAG does," referring to Walgreens's membership plan. Wehenman Tr 1014-1015. Although two Humana senior leaders found it "interesting," there is no evidence that his comment caused anyone to respond to his email in anyway. Humana did not request that he follow up or investigate at all to find out whether Walgreens was reporting the membership prices as U&C. Duke Tr 177, Ecleberry Tr 966-967. Wehenman Tr 1015-1017, 1067.

59.     Although Wehenman's view as to whether membership prices must be considered U&C charges had been consistent with that of the pharmacy industry generally, it changed after the Seventh Circuit's May 2016 decision in *Garbe*, a qui tam proceeding against Kmart. *Garbe* was not initiated by any of the significant pharmaceutical payors. It began when a pharmacist at

a Kmart pharmacy obtained a personal prescription at a competitor pharmacy and saw that the charge by the competitor to his Medicare Part D insurer was much less than Kmart ordinarily charged for the same prescription.   *Garbe* at 634.   He then investigated and discovered that Kmart regularly charged customers with insurance more than customers who paid without insurance. People in Kmart's "discount programs" paid less than the price Kmart reported as it U&C prices for the same drugs.  *Id.*   He initiated a qui tam action claiming that Kmart had overcharged the government.   The government declined to intervene.

The Seventh Circuit heard the case on interlocutory appeal from the district court's ruling granting Garbe summary judgment on some issues and denying Kmart summary judgment on others.  *Garbe* at 635.   In *Garbe*, the court did not point to any specific regulation or law defining U&C charges, rather it determined, **based on the facts presented in that case** regarding the Kmart membership program and a statement from the CMS Manual, that the Kmart membership program prices were Kmart's U&C charges for those drugs. *Garbe* at 644-645.

60.    In 2016 Humana and CVS engaged in extensive negotiations regarding amending the Agreement, but the definition of U&C was not part of the discussion.   White Tr 569 -571. Following the negotiations, in July 2016, almost six months after CVS had terminated the HSP program, CVS sent Humana a redline of the Agreement proposing numerous extensive revisions. Ex 700.  One of the many revisions was a new section 1.22 with a U&C definition that specifically excluded coupons, discount card programs, and membership programs where an enrollment fee was required. Ex 700 at 13.  Four hours after receiving the proposal, Humana rejected the entire proposal because it changed "just about everything" and introduced "generic caps, higher retail rates, higher Specialty rates etc." Humana made no reference to the proposed U&C definition, and responded  that CVS and Humana should "leave everything as is."  Ex 701    There was no

discussion regarding CVS's proposed definition of U&C.  White Tr 573.  It is not clear that Humana actually noticed the proposed U&C definition in the short four-hour period before it rejected the entire redlined draft.

61.     In May 2017, about a year after the *Garbe* decision, Caremark, CVS's affiliated PBM, initiated a discount card prescription savings program targeting uninsured and underinsured patients needing insulin, the   Reduced Rx program.  Ex 763.    There is no membership fee.  King Tr 1541, Gibbons Tr 514.   In the Reduced Rx program, anyone who downloads a Reduced Rx card can obtain three types of Novo Nordisk insulin from any of 67,000 participating pharmacies, of which 9,700 are CVS pharmacies, in return for a payment of $25. Ex 763, King Tr 1541.  Insured people may purchase under the Reduced Rx, but they may not use their insurance for the purchase. King Tr 1539-1540.  In some instances, insureds can obtain the same medications for a copay lower than $25 using their insurance. In other instances, it is more expensive for insureds to purchase these medications through their insurance than under Reduced Rx. King Tr 1549-1550, 1565 and Ex 751.  Humana's own pharmacies accept Reduced Rx cards.  Ex 1123 ¶7

62.      In return for supplying Novo Nordisk insulin under the Reduced Rx program, a participating pharmacy receives total compensation equal to the lower of (a) a negotiated rate or (b) its U&C charge. Ex 1123 ¶¶12 and 17.  Caremark adjudicates Reduced Rx purchases and pays the pharmacy whatever amount, in addition to the $25 payment collected by the pharmacy from the cardholder, is necessary to ensure that the pharmacy receives the full amount due. Ex 1123 ¶17.  Caremark receives funds from Novo Nordisk.  Duke Tr 224-225, Gibbons Tr 480 – 482, Ex 1123 ¶ 19.

63.     Utilization of the Reduced Rx program is relatively low.  Less than 14,000 purchases occurred under the program in the first four years and four months of its existence. Ex 1123 ¶22.  Only about 25% of those purchases occurred at CVS pharmacies.  Graveline Tr 1964.

64.     Other than the claim asserted by Humana in this arbitration, no insurance company or PBM has contended that the participants' $25 payment should be considered CVS's U&C price for the medications involved.   Ex 1123 ¶ 20.

65.     There is "broad consensus" within the NCPDP and its members that the term "cash customer" does not include a customer, like one using the Reduced Rx program, who purchases a drug and for whom "a third-party pays any portion of the drug's price."  Beckley Tr 2557 – 2558, Ex 766 ¶ 25.

## Analysis

### HSP membership prices.

66.     The meaning of the phrase "usual and customary charge" in exhibit D to the Agreement determines the outcome of the parties' dispute regarding CVS's HSP membership prices.   Each side agrees that, because the Agreement lacks a definition, the meaning must be gathered from external sources that show what the term was commonly understood to mean in the pharmacy industry when the contract was entered in 2001.

67.     Humana asserts that the phrase means the "lowest price a pharmacy makes widely and consistently available" and that this definition includes prices available under pharmacy membership programs such as the HSP program.  CVS asserts a different definition, "the retail price the pharmacy makes available to every customer" excluding any form of benefit such as discount cards or membership programs.

68.     Both sides acknowledge the importance of the NCPDP guidance as a source of industry understanding.  But, as noted above, the language of NCPDP's definition, the "[a]mount charged cash customers for the prescription exclusive of sales tax or other amounts claimed," Ex 5 at 71, is not sufficient by itself to resolve the dispute.  Its meaning and application here depend on the industry understanding of "cash customer" and the "cash price" paid by that type of customer.

69.     Humana contends that a "cash customer" is any customer who purchases without insurance. It insists that customers not purchasing through insurance are all "cash customers," and, thus, the price paid by a customer not using insurance is the "cash price."    Duke Tr 86. CVS contends that a cash customer is a customer who purchases without using insurance or any other form of benefit such as a membership program and, thus, only the prices paid without insurance or any other form of benefit are "cash prices."   All agree that only "cash prices" need be considered in determining or reporting U&C prices or charges.

70.     The preponderance of the evidence in this proceeding supports CVS's position.

71.      When Lambert was Humana's Director of Pharmacy Networks in 2006 and 2007, he did not understand that membership program prices, like the HSP prices, were a pharmacy's "cash" prices and did not expect pharmacies to report them as U&C charges.

72.     Lambert's understanding was consistent with that reported in Dr. Fein's 2009 U.S. Pharmacy Industry: Economic Report & Outlook, which  Dostal and others at Humana read and respected. Fine's report continued to be considered authoritative when it was cited in the 2013 Update to Pharmaceutical Payment Methods published by the AMCP, a reputable pharmacy trade organization that attracted the involvement of key Humana pharmacy benefits people.

73.     Like Dr. Fein,  PBMs and, at least initially, many state Medicaid programs,  did not consider the prices of a membership program  to be U&C charges where, like the HSP program, the program required a fee and enrollment. Their determination has credibility. PBM's seek for their clients to negotiate the lowest possible price with retail chain pharmacies like CVS.  Wingate Tr 866 - 868.  Although Humana asserts that PBM testimony lacks credibility due to the potential that a PBM may benefit to some extent if U&C charges remain high and allow a greater "spread" between the amount received by the PBM and the amount it pays to the pharmacy, the PBM testimony here seems credible because it is consistent with Dr. Fein's report and the AMCP as well as that of Humana personnel like Lambert and Dostal. Moreover, PBMs whose major objective is to obtain the lowest prices for their clients, have more credibility on this point than current Humana employees and retained experts whose incentives to testify in line with Humana's position are extremely strong.  It is not reasonable to conclude that PBM's would have refrained from categorizing membership prices as U&C charges had they not actually understood this to be appropriate, in light of the potential liability they might bear for not defining and reporting U&C prices properly.[8]

74.     That CVS did not create a written record when it contacted payors about HSP in the early days of its HSP program  seems reasonable in the context of a well-known industry understanding that these membership prices were not "cash" prices that should be treated as U&C

---

[8] Humana points to the Grinsteinner declaration, Ex 1109, as evidence that PBM's did not "uniformly" support CVS's position. Humana Reply at 11.  But, her declaration that the prices of discount programs lacking "meaningful enrollment fees" should be U&C does not suggest that prices of HSP with its enforced and meaningful enrollment fee should have been considered U&C prices.   Humana also contends that the testimony of PBMs and other industry participants supporting CVS's position is outweighed by the fact that a number of  third party payors eventually asserted claims against CVS and other pharmacies after the complaint in Garbe D. Ct. was unsealed in September 2010.  Humana Reply at 10.  But, the actions of payors, after the *Garbe* litigation became public, are not as reliable as a guide to the industry understating as statements closer to the time in 2008 when CVS initiated the HSP program.

charges.  The lack of any immediate objection from the payors notified further confirms CVS's position.

75.     Humana is a large, sophisticated company. Its pharmacy benefits team closely monitored developments in the pharmacy industry.  It was aware of the details of the membership programs that preceded the HSP program as well as the details of the HSP program.

76.     The following facts show that, despite its contentions otherwise, prior to *Garbe*, Humana knew and accepted the fact that CVS, Walgreens and other pharmacies with membership programs were not reporting their membership prices as their U&C prices.

a)      The most reasonable inference from the evidence regarding CVS's plan to contact its payors when the HSP program began is that Marks complied with Wingate's directive and contacted Blanton of Humana to explain that CVS would not be reporting HSP prices as U&C and, further, that Blanton made no objection.

b)      Dostal of Humana was aware, roughly sometime in 2008, that pharmacies like Walgreens and CVS were not reporting their membership prices as U&C, but no one from Humana made any objection to CVS.

c)       Even though Humana knew in 2009 that Walgreens and Rite Aid were not reporting their membership prices as U&C and that this led to complaints from Humana insureds, Humana took no steps to find out whether CVS was following the same approach.  It did not ask CVS directly nor did it make any attempt to sample CVS claims, even though, at least prior to 2011, Humana should have been able to figure out what CVS was doing, if indeed it had any doubt about it.  Humana had investigated Wal Mart claims in

2006 to determine whether Wal Mart was reporting its discounted generic prices as U&C.   It could have done the same as to CVS's HSP prices, even though it may not have been able to conduct a comprehensive precise audit of the issue.

d)     Even though White of Humana was sufficiently concerned by Rite Aid's failure to report its membership prices as U&C to suggest that Humana have a "pound sand" conversation with Rite Aid, Humana did not have this conversation with Rite Aid.

e)     Humana must have been aware of CVS's dispute with Connecticut Medicaid and the fact that CVS refused to report its HSP prices as U&C to Connecticut Medicaid in 2013, but Humana made no complaint or inquiry to CVS then.

f)      Humana failed to make any inquiry to CVS or initiate any sort of investigation in May or December 2013, even though Wehneman, its director of audit, pointed out that he believed pharmacies were not reporting their membership prices as U&C.

g)     Despite the magnitude of its potential claim if, as Humana contends, CVS had been obligated to report its HSP prices as U&C, Humana made no complaint to any pharmacy regarding its failure to report membership prices as U&C prior to December 2017 and no complaint to CVS prior to August 2018.

77.    Humana's own witnesses, including two of its experts, undermine its proposed definition of cash customer, i.e.  a "cash customer" is anyone who is not purchasing using

traditional insurance.  Humana experts, Beckley and Hayes, and one of Humana's witnesses, Ecleberry, conceded that there are customers who purchase using a benefit other than traditional insurance but are not "cash customers."   Beckley testified that a customer who purchases a drug in a transaction where a "third-party pays any portion of the price of the drug" is not a "cash customer." Beckley Tr 2558 and Ex 766 ¶ 25. He further admitted that "there is a broad consensus" among the members of the NCPDP on this point.  *Id.*  His testimony on this point used the term "third party" rather than "insurance company" and, thus, acknowledged that involvement of non-insurance benefits prevents a transaction from being a "cash" purchase by a "cash customer." Hayes gave similar testimony.  She agreed that where a customer uses a discount card to purchase a drug by paying only a portion of the retail or cash price, the amount paid by the customer is not the U&C.  Hayes Tr 1201-1203.  Hayes admitted further that discount card sales do not impact the U&C price, even though they are not insurance.  Hayes Tr 1194.  Ecleberry, a Humana market leader with responsibility for Humana's contracts with pharmacy chains, agreed that a person who purchases with  "the benefit of a negotiated price provided through a plan or PBM with a contract with the pharmacy provider" is not a "cash customer."  Ecleberry Tr 948.   This testimony makes clear that, although at times people in the pharmacy industry, including CVS, See Ex 673 at page 15/39, loosely refer to "cash customers" as those purchasing without insurance and sometimes make confusing statements when discussing the subject,[9] the term is more limited than simply those purchasing without insurance.  Humana's experts essentially concede that a "cash customer" must purchase without insurance or any other forms of pharmacy benefit.

---

[9] For example, Veale of CVS testified that when people use the word "cash … liberally" they may include cash discount programs within the meaning of "cash" and, thus, include customers using those programs as "cash customers."  Tr Veale 1689.  But Veale made clear that the industry does not consider customers purchasing with discount cards to be "cash customers" or the prices paid under those programs to be "cash" prices.  Tr Veale 1621,

78.     The evidence summarized above confirms the opinions of CVS's experts that the HSP membership program prices were not CVS's U&C prices and that the term "cash customer" refers to a customer who purchases a medication without insurance or any other type of benefit program.  See McGinley Tr 2169 (Purchasers using HSP membership were not cash customers because they purchased through a program that provided a benefit and required enrollment); Ex 937 ¶ 49 (  It is "well understood and accepted in the pharmacy and PBM industries" that a "cash customer" is one who purchases without any type of "benefit program – no insurance, no discount care, no membership program, no manufacturer program, patient assistance program, etc."); Hillblom Tr 2610 ("[A]bsent an explicit contractual or regulatory provision stating" otherwise the "general industry understanding is" that prices from a pharmacy "membership program or third-party discount card transaction are not the pharmacy's usual and customary prices.")

79.     The testimony of these Humana witnesses together with the other evidence and testimony discussed above, including the course of dealing between Humana and pharmacies like Walgreens, Rite Aid and CVS that offered membership programs, shows that CVS's definition of "cash customer" was the prevalent industry definition.

80.     A "cash customer," as the term is understood by the pharmacy industry, is a customer who purchases a medication without the benefit of insurance or any other form of benefit. Members of CVS's HSP program who paid the annual fee and enrolled in the program in order obtain the membership benefit of purchasing at the HSP prices were not "cash customers."  It is true, as Humana points out, that the HSP program was developed as a way to retain "cash" customers and, for that reason, sometimes was referred to with terms including "cash" in the reference. But these references do not change the fact that customers buying with an HSP membership were not "cash customers" for purposes of the NCPDP definition or the Agreement.

81.     Thus, under the NCPDP definition that Humana invokes, the Agreement did not require CVS to report its HSP prices as its U&C charges or mandate that those prices were a limit on the amount that Humana would reimburse CVS.

82.     Humana's arguments do not overcome the facts summarized above.

83.     Humana relies heavily on *Garbe*. But *Garbe* does not require that Humana's definitions of U&C charge and "cash customer" be imposed on the Agreement here despite the facts discussed above.  Nor does it require that the HSP program prices be considered U&C prices under the Agreement.   This is so for a number of reasons.

    a)    The holding in *Garbe*  is not binding in this proceeding.  *Garbe* is a decision of the U.S. Court of Appeals for the Seventh Circuit.  This is an arbitral proceeding seated in Atlanta, Georgia based on a contract controlled by Kentucky law.   CVS was not a party to *Garbe*.

    b)    Even if this were a court proceeding in the Seventh Circuit, *Garbe* would not dictate the result because, as the Seventh Circuit pointed out in   *United States ex rel. Schutte v. Supervalu Inc*., 9 F.4th 455, 461 (7th Cir. 2021), *Garbe*'s holding was based on the facts before the Court in that case on a summary judgment motion.  *Garbe*'s U&C definition was a factual finding regarding the pharmacy industry's understanding of the term based on the factual record in that case, Garbe D. Ct.  at 1015, not the facts summarized above.  Even though, as Humana points out, the courts in Garbe D. Ct. and *Garbe*  considered some evidence regarding industry perspectives, there is no indication that *Garbe* considered the full range of evidence, expert opinions and live testimony presented in this proceeding.  For example,

there is no indication in *Garbe* that the court considered testimony like that described above from Humana's Lambert, Dostal, and Ecleberry  or evidence like that here showing the course of dealing between CVS and Humana or Humana and other pharmacies, the significance of the annual membership fee to the average CVS cash customer, or the inconsistencies between Humana's proposed definition of "cash customer" and admissions of Humana's own experts.   And *Garbe*'s determination that the Kmart membership program prices fit its definition of U&C prices was also a factual determination based on the facts of that specific program, not the facts described above. *Garbe* at 643-644 Moreover, as noted by the Seventh Circuit in *Schutte* at 468-469, it would have been "reasonable" for a pharmacy like CVS and a payor like Humana to have intended U&C in the Agreement to mean CVS's "retail" price.

c)      Further, the significant differences between the Kmart program evaluated in *Garbe* and the HSP program make it doubtful that the Seventh Circuit would have concluded that HSP prices are U&C prices, even applying its factual finding that the industry definition of U&C price is the "lowest price made widely and consistently available" to the "general public."

   i. The Kmart membership program, as described in *Garbe*, was intended to and did reach 89% to 99% of all Kmart cash customers. Garbe D. Ct. 1018 n. 10, Garbe at 643-644.   *Garbe* at 643 noted that "barriers" to participation in the Kmart program were "almost nonexistent," and that cash customers were "pushed into" membership.  It expressed doubt as

to whether the Kmart $10 annual fee and other enrollment requirements "were enforced at all." *Id.*   *Garbe* described Kmart's $10 fee as "nominal" without referencing any evidence as to how the fee actually impacted Kmart customers. Humana's Post Hearing Reply Brief ("Humana Reply") at 2-3 acknowledges that the existence of only "nominal or artificial barriers to entry" was a factual finding critical to the *Garbe* determination that the membership prices there were "available to everyone" and, thus, fit the U&C definition adopted in *Garbe.*

ii.  In contrast, the evidence here shows that CVS intended its program to have limited appeal. CVS designed and enforced effective barriers to entry regarding HSP that limited participation.  Ex 150 at 3, 11 (the program's appeal is for "specific consumer groups" and the intent was "not to convert all cash prescriptions to the Health Savings Pass."), Ex 80 ("not trying to attract as many people as possible into the program") As noted above, only a small portion of the CVS customers buying without using insurance (only 4.3%) purchased through HSP.  The barriers to entry prevented HSP prices from being truly available to the general public.  CVS enforced the HSP fee requirement.  It was a significant and effective barrier.   The fee, in practice, was not considered nominal by CVS cash customers.  CVS demonstrated with unrebutted evidence that, for most CVS cash customers, the fee made

the program a poor financial choice and was not actually "nominal"[10] because the fee made it more expensive to buy under the HSP program than buying at CVS retail prices.   The Court in *Garbe* clearly assumed that the fee requirement there, based on the level of enforcement there, did not impose a financial barrier.   It is difficult to believe that the *Garbe* court would have found Kmart's program prices truly "available" to the general public had Kmart imposed and enforced effective barriers such as an annual fee that made it financially disadvantageous for most cash customers to participate.   Although, as Humana points out in its Post Hearing Brief at 18, some decisions have rejected distinctions based on "how many customers signed up," those decisions do not reject distinctions based on the existence of effective barriers to entry or participation data presented as proof that barriers to entry were effective.   In fact, as noted above, Humana concedes that *Garbe*'s holding is limited to membership programs with only "nominal or artificial barriers to entry."  Humana Reply at 2-3.

84.    Humana relies on the Walgreens Op.  That interim arbitral award agreed with Humana's contention that Walgreens's membership prices were U&C prices.  Based on its reading of *Garbe*, the Walgreens Op declared that *Garbe* "established" a "default" definition of U&C prices as "the lowest price made widely and consistently available to the general public." It declared that this "default" definition automatically determines the meaning of U&C in pharmacy agreements lacking further definition of U&C price.  Walgreens Op at 15, 29.  Based on that

---

[10] "Nominal" according to the on line edition of *Oxford's English dictionaries*  as an adjective means "existing in name only" or "far below the real value or cost."

determination, the Walgreens Op then looked to see if Humana and Walgreens had "further defin[ed]" the term U&C to exclude Walgreens's membership prices. *Id.* It concluded that they had not based primarily on its analysis of the evidence regarding the negotiations between Humana and Walgreens in 2009. Essentially, the Walgreens Op concluded that when Walgreens agreed to remove its proposed exclusion of "discounts" from the U&C definition in course of negotiating its 2009 agreement with Humana, Walgreens effectively agreed that its membership program prices fell within the contract definition of U&C. Walgreens Op. at 21 and 28. The Walgreens Op. further applied its "default" rule to conclude that Walgreens's 1998 agreement also included Walgreens's membership prices within the meaning of U&C because no "negotiating history" was presented. *Id.* at 28. Despite Humana's contentions, the Walgreens Op., does not impose Humana's definitions of U&C charge and "cash customer" on the Agreement here. Nor does the Walgreens Op. require that the HSP program prices be considered U&C prices under the Agreement.

      a)     Like, *Garbe,* the Walgreens Op., is not binding on CVS in this proceeding. It was an arbitration regarding the meaning of a term in an agreement between Humana and Walgreens. CVS was not a party to the agreement or the arbitration in Walgreens.

      b)     More importantly, the Walgreens Op, does not sufficiently explain its declaration that *Garbe* established a "default" rule as to the meaning of U&C charges in all pharmacy agreements, even those involving parties not participating in *Garbe.* This declaration is the foundation of the core Walgreens Op ruling. It is difficult to understand how this "default rule" bound Walgreens in that arbitration or how it binds CVS in this proceeding.

As explained above, the U&C definition adopted in *Garbe* is in large part a factual determination based on the record in that case. It does not bind other pharmacies like Walgreens or CVS who did not participate in *Garbe* and whose membership programs and contracts were not before the courts involved in *Garbe.*   Humana does not point to any authority indicating that a nonparty to a federal court case in a foreign federal circuit is somehow bound by factual determinations made in the course of that case.

    c)    There appear to be many significant differences between the facts presented in the Walgreens arbitration and those presented in this one. For example, there is no indication that the Walgreens Op arbitrator received testimony like that of Humana's Lambert, Dostal, and Ecleberry or evidence like that presented here of the course of dealing between CVS and Humana, the data showing the significance of the annual membership fee to the average CVS cash customer, or the inconsistencies between Humana's proposed definition of "cash customer" and the admissions of Humana's own witnesses, including its experts.  Walgreens apparently did not show that it informed Humana that it was not reporting its membership prices as U&C, Walgreens Op 27, as CVS did here.

85.    Humana similarly invokes the final arbitral award in *Humana Health Plan, Inc et al v Rite Aid HDQTRS. Corp et al* ("Rite Aid Op").    The Rite Aid Op concluded that the prices of Rite Aid's membership program should have been reported to Humana as U&C charges under Rite Aid's agreement with Humana. But, for reasons similar to those discussed in regard to the Walgreens Op, the Rite Aid Op does not does not impose Humana's definitions of U&C charge

and "cash customer" on the Agreement here.  Nor does it require that the HSP program prices be considered U&C prices under the Agreement.  CVS was not a party to the Rite Aid Op arbitration and is not bound by it.   Furthermore, the Rite Aid Op is not based on the facts presented in this proceeding.  There appear to be many significant differences.   The Rite Aid Op relies in part on its determination, at 15-17, that the term "usual and customary *retail price*" [emphasis added] in section 2.2 of the Rite Aid agreement with Humana had a different meaning than the term "usual and customary charge" in the reimbursement provisions in Exhibit D of the Rite Aid agreement. The language of the Rite Aid agreement is similar to that of the Agreement here.  But, in this proceeding, Duke, Humana's director of pharmacy networks and pricing, agreed that the phrase "usual and customary charge" in Exhibit D of the Agreement here has the same meaning as the term "usual and customary *retail price*" [emphasis added] in §2.2 of the Agreement here.  Duke Tr 228.  It was "critical" to the Rite Aid Op that Rite Aid sold prescriptions at its membership prices "five times more often than at retail prices, and in certain years, fourteen to fifteen times more often." Rite Aid Op 29.   For CVS, however, the cash purchases of HSP drugs outside of the HSP program were about four times the number of purchases of those drugs occurring under the program. Ex 938 ¶36.   Rite Aid did not charge a membership fee.  In contrast, as noted above, CVS imposed a membership fee that served as a significant barrier to HSP membership for many customers.  In Rite Aid, the arbitrator noted that Rite Aid "sought to conceal" its position regarding its membership prices and "never intended to disclose" that it was not reporting them as U&C. Rite Aid Op 29.  Here, CVS from the beginning instructed its team to inform payors, including Humana, that it would not report HSP prices as U&C.  As was the case regarding the Walgreens arbitration, there is no indication that the Rite Aid proceeding included testimony like that of Humana's Lambert, Dostal and Ecleberry here supporting CVS's position or evidence like that

presented in this arbitration regarding the course of dealing between CVS and Humana, the inconsistencies between Humana's definition of "cash customer" and the admissions of its experts, or the industry publications referenced above.

86.     Humana contends that, despite the facts summarized above, the language in Exhibit E of the Agreement requiring CVS to "comply with and [be] subject to all applicable Medicare program rules and regulations" imposes its proposed definitions of U&C and "cash customer" on the Agreement.   Humana, however, has failed to point to any federal regulation that actual does this.  Nor has it shown how CVS has failed to comply with any specific Medicare rule or regulation. In its argument regarding Medicare regulations, Humana focuses primarily on the definition of U&C in 42 C.F.R § 423.100.[11] But Humana fails to show specifically how CVS has violated any regulation that incorporates that definition. Humana concedes, Humana Reply at 6, that an in-network pharmacy like CVS would charge "in-network, negotiated prices" for drugs covered by Medicare Part D, not a U&C price.  Although *Garbe* at 644 noted that the defined U&C term is included in "state regulations, plans, and contracts related to Medicare Part D," Humana has not shown that defined term was incorporated into the Agreement. Furthermore, the definition refers to the price for purchases without "any form of prescription drug coverage," such as a benefit plan like CVS's HSP program.  It does not say without any form of "insurance," a term that is specifically defined in the regulation. Thus, even if the definition somehow applied to CVS, it would not include CVS's HSP membership prices. The other regulations Humana references 42 C.F.R. §§ 423.315(a),  and 423.505(h)(1), (i)(3)(v), (i)(4)(iv) , (k)(1), (k)(3), merely state the general principles such as Humana's obligation to make accurate reports and comply with laws

---

[11]  The definition is "[u]sual and customary (U&C) price means the price that an out-of-network pharmacy or a physician's office charges a customer who does not have any form of prescription drug coverage for a covered Part D drug."

and regulations designed to prevent fraud and, further, declare that pharmacies must do the same. None of them impose Humana's definition on the Agreement.  Humana has not shown that CVS has violated any of these regulations by not reporting its HSP prices as U&C.  The language in the CMS Manual from 2006 referenced in *Garbe* does not establish that CVS's practice violated any federal law or regulation. The August 2009 report of Office of Inspector General of the U.S. Department of Health and Human Services specifically stated that CMS "does not have a stated policy as to whether the prices charged" to members of membership programs that require enrollment fees "meet the definition of a usual and customary charge to the public." Ex 277 at 7 and n 26.  Although the federal government investigated CVS's practices regarding its HSP program as part of its investigation in connection with the *U. S. ex rel Winkleman* false claims law suit against CVS,  it declined to intervene, and the case against CVS was ultimately dismissed.  Tr Gibbons 454 -455[12]

87.    Humana contends that the negotiations regarding amending the Agreement in 2016 support it position.   But this is not the case.   White of Humana conceded that the definition of U&C was never discussed at any point in the extensive negotiations that apparently resulted in leaving the Agreement as it was.  CVS sent Humana a lengthy redline of the Agreement in July 2016, months after it terminated the HSP program, with many apparently extensive and substantive proposed revisions.   Human rejected the entire draft within four hours of receiving it, making comments on several of the proposed revisions but not the proposed definition of U&C that was

---

[12] Humana also refers to a footnote in an October 2006 memorandum from CMS, the "Tudor Memo" Ex 27, and a 2012 Letter from the Department of Justice ("DOJ") to CVS in connection with its investigation of HSP pricing, Ex 508, in support of its assertion that CVS's handling of HSP prices violated a federal regulation.   The footnote in the Tudor Memo, however, pertains only to Wal Mart's low generic prices that were immediately available to all customers, not a membership program like HSP.   And the 2012 investigation letter shows merely that the Department conducted an investigation.  It is much more significant and telling that DOJ did not intervene in the Winkleman case against CVS.

included.  This course of negotiations sheds little light on  the meaning of the term U&C in the Agreement, which the parties had entered fifteen years earlier.

88.     Humana asserts that CVS's U&C definition must be rejected because, according to Humana, U&C must be defined in a way to guarantee that its insureds never pay a higher price by purchasing through their Humana insurance.  But, as noted above, Humana's own experts concede that the industry understanding of U&C does not include this guarantee.  They admit that discount card prices are not considered U&C charges even though they may at times be lower than prices available to Humana insureds.  Hayes Tr 1194 -1203. As noted in the Walgreens Op (that Human invokes) at 21, and in the record here,  Humana was aware that its members might at times be "better off *not* using their insurance benefits."  Thus, the term U&C in the Agreement does not, as Humana contends, guarantee that its insureds would never be able to get a lower price by purchasing outside of their insurance.

89.     Humana further notes CVS's expressed intent to design its HSP program in a way that minimized the risk that its U&C charge would be impacted.   Humana insists this intent proves that CVS violated the Agreement. This argument fails, however, because it was entirely reasonable for CVS to carefully consider the meaning of U&C charges under the Agreement, assess the level of risks involved in different approaches and design its HSP program in a way intended to respond to competition without the severe financial impact of having to report its HSP prices as U&C charges.   The Walgreens Op, which Humana applauds, acknowledged that similar conduct by Walgreens did not mean that Walgreens knew what it was doing was wrong. Walgreens Op 31-32.  The arbitrator in Walgreens found Walgreens position to be "objectively reasonable."  Here, as noted above, CVS's position was not only objectively reasonable but was accepted by Humana and many other payors for years.

<u>Reduced Rx</u>

90.     Humana contends that the $25 CVS collects from the customer for a purchase under the Reduced Rx program is CVS's U&C charge for that medication.   Thus, under Humana's view, CVS has violated and continues to violate the Agreement by failing to report $25 as the U&C charge for the three types and dosages of insulin covered by the Reduced Rx program.

91.     In support of its position,  Humana makes three basic arguments: (a) that the $25 copay is the "widely and consistently available cash price" for these medications; (b) that Reduced Rx is a cash program rather than a discount card program and should not treated as a discount card program; and (c) that the additional payment Caremark makes to CVS, using funds from Novo Nordisk, is merely a "flimsy device"  that should be disregarded in determining the actual cash price for the medications.

92.     The overwhelming weight of the testimony and evidence presented, however, undermines Humana's arguments.

93.     Despite the various versions of the language used by CVS and others to describe the Reduced Rx program, at times referring to it as a cash program or a program for cash customers, the facts as to the actual substance of the program make clear that the $25 collected from customers is essentially a copay, not the full actual retail or cash price for the insulin covered by the program. Unlike a true retail or cash price which is the full amount charged by a pharmacy for a drug, the $25 payment is only a portion of the compensation that CVS and other participating pharmacies demand and receive for the medications they provide under the program.   Thus, even if one were to concede that the U&C is the amount "widely and consistently" charged, the $25 copayment would not be the U&C charge because it is not the full amount charged and received by CVS for the medication.

94.     Moreover, as discussed in more detail above, the U&C charge that CVS is obligated to report to Humana under the Agreement is the amount CVS charges a "cash customer." Here the record makes clear that the $25 Reduced Rx copay is not CVS's U&C charge for relevant insulin products. This is so because purchasers under the Reduced Rx program are not "cash customers" as that term is widely understood in the pharmacy industry.

95.     As noted above, Humana's own witnesses, including two of Humana's experts, conceded the point.   Beckley and Hayes conceded that the portion of the price paid by a purchaser who purchases drugs in a transaction where a third party also contributes is not the "cash price" or the U&C price. Beckley Tr 2558 and Ex 766 ¶ 25; Hayes Tr 1201-1203.   Hayes admitted that prices paid by customers using a discount card do not impact the U&C price.  Hayes Tr 1194. And, as noted above, Ecleberry, agreed that a "cash customer" is not one who purchases with "the benefit of a negotiated price provided through a plan or PBM with a contract with the pharmacy provider."   Ecleberry Tr 948.   Based on their testimony, customers who purchase under the Reduced Rx program are not "cash customers," and the portion of the price they pay is not the "cash price" that must be reported as the U&C charge.

96.     Although it is true, as Humana contends, that the Reduced Rx program is not a traditional discount card program.   Humana has not pointed to significant differences. Reduced Rx is not like traditional discount card programs only because it is limited to three specific products and provides a specific amount to be collected from the customer as to each. It is otherwise in all material respects the same as a discount card program.  Like most discount card programs, participating pharmacies send transactions to Caremark for adjudication and learn what to collect from the customer and what additional amount Caremark will pay.   Humana has not pointed to

any material difference between the Reduced Rx program and the discount card programs that its

expert, Hayes, agreed should not impact the determination of a pharmacy's U&C charge.

97.     Caremark's adjudication of Reduced Rx transactions and payments to participating

pharmacies are  not merely a "flimsy" device.   Caremark receives funds from a third party, Novo

Nordisk, and pays participating pharmacies whatever amount is necessary to ensure that each

pharmacy receives the full amount that it is entitled to receive under the program, which is no less

than its U&C charge.   CVS pharmacies represent less than 15% of the 67,000 participating

pharmacies.   There is no evidence that Caremark fails to make the additional payments to

participating pharmacies under the program or that any pharmacy is willing to dispense insulin

under the Reduced Rx program for nothing more than the $25 copayment it collects from the

customer.

Covenant of Good Faith and Fair Dealing

98.     In addition to its breach of contract claims, Humana contends that CVS's failure to

report its HSP prices as U&C charges breached the implied covenant of good faith and fair dealing

implicit in the Agreement under Kentucky law, the applicable law here.   This claim fails because,

as discussed in detail above, CVS's practice of not reporting HSP prices as U&C charges complied

with the meaning of U&C charges in Exhibit D of the Agreement.     Under Kentucky law, a party

to a contract does not breach the implied covenant of good faith and fair dealing by exercising "its

contractual rights." *Epps Chevrolet Co.* v. *Nissan North American, Inc.,* 99 F. Supp. 3d 692, 702

(E. D. Ky. 2015) It was not " 'inequitable' or a breach of good faith and fair dealing" for CVS to

"act according to the express terms" of the Agreement. *Id.*     Humana insists that there is no

"express" term here.   But "U&C charges" as used in Exhibit D is an express term.   As explained

above, CVS complied with the meaning of that term.   Thus, Humana cannot claim a breach of the

41

implied covenant of good faith and fair dealing.  One of the decisions Humana cites in support of its position is *Massachusetts* v *Mylan Laboratories*, 608 F. Supp. 2d 127 (D. Mass. 2008) which appears to apply Massachusetts law rather than Kentucky law.  But even *Mylan* acknowledges that the compliance with the implied covenant is "circumscribed by the obligations … actually contained" in the agreement between the parties.  *Id.* at 158.  Humana also insists that CVS's practice violated the implied covenant because it defeated the intent of the pricing provisions.  This contention fails, however, because as discussed more fully above, the pricing portions of the Agreement were not drafted, as Humana contends, to guarantee that Humana insureds would never be able to buy drugs at a lower price outside of their Humana insurance or to forbid any programs that might somehow offer drugs at a lower price than that available under Humana's insurance.  Humana understood that, under some circumstances, Humana insureds might pay a lower price by not using their insurance.  Humana has not shown that CVS's decision not to report its HSP prices as U&C charges undermined the bargain set forth in the Agreement.  Rather, the record here shows that CVS complied with the terms of the Agreement and, further, that CVS did not attempt to hide from Humana either the terms of the HSP program or CVS's position that HSP prices were not U&C charges.

## Negligent Misrepresentation and Unjust Enrichment

99.    Humana asserts two additional non contractual claims:  negligent misrepresentation and unjust enrichment.  Each of these claims fails, however, because as discussed above, Humana has not shown that CVS reported false or inaccurate U&C charges regarding HSP eligible drugs or that CVS's claims regarding those drugs were artificially inflated.   In addition, Humana is not

free to pursue an unjust enrichment claim based on CVS's compliance with its obligations under the Agreement. *UPS Co. v. DNJ Logistic Grp., Inc.,* 2017 WL 3097531, at *9 (W.D. Ky. July 20, 2017) (Under Kentucky law, unjust enrichment does not apply where "there is an explicit contract which has been performed."); *Furlong Dev. Co. v. Georgetown-Scott Cnty. Planning & Zoning Comm'n,* 504 S.W. 3d 34, 40 (Ky. 2016) (Unjust enrichment "is unavailable when the terms of an express contract control.")

<u>Costs and Fees.</u>

100.    The applicable arbitration agreement here provides that the "cost of any arbitration proceeding(s) hereunder shall be borne equally by the parties" and that each "party shall be responsible for its own attorneys' fees and such other costs and expenses incurred related to the proceedings." Ex 76 at 4.   Thus, each party shall share equally in the costs of this arbitration proceeding and bear its own attorneys' fee and other costs.

**<u>AWARD</u>**

For the reasons stated above, the Arbitrator makes the following award:

Humana's claims against the Respondents for breach of contract, negligent misrepresentation and unjust enrichment are denied and dismissed with prejudice.   Claimants and Respondents shall share equally in the costs of this proceeding and bear their own attorneys' fees and other related costs.

Date: May 24, 2022

_____

Henry L. Parr,  Jr. Arbitrator